United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

HIGH SIERRA HIKERS ASSN, et al.,

      Plaintiffs,

  v.

BERNIE WEINGARDT, et al.,

      Defendants.

_____/

No. C-00-01239 EDL

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## I.      Background

On April 10, 2000, Plaintiffs High Sierra Hikers Association, et al. ("Plaintiffs") filed this action for declaratory and injunctive relief against Defendants Bradley Powell, et al. ("Defendants")[1], alleging violations of the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1687, the Wilderness Act, 16 U.S.C. §§ 1131-1136, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370d and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 arising from the Forest Service's allowance of special use permits for commercial packstock operations in the Ansel Adams and John Muir Wilderness areas.  On June 5, 2001, the Court issued an order regarding the merits of the parties' cross-motions for summary judgment, and on January 9, 2002, after further briefing, issued an order granting injunctive relief and ordering the Forest Service to complete a NEPA cumulative impacts analysis by December 31, 2005 and a site-specific analysis for each special use permittee for packstock operations by December 31, 2006. The Court also ordered interim protective measures, including, *inter alia*, a reduction in the service

---

[1]     Defendant Powell has been replaced as a defendant in this matter by the current Regional Forester of the Forest Service, Bernie Weingardt.

1    day allocation for packstock operators, a reduction in maximum packstock group size and

2    implementation of trailhead quotas.  Both sides appealed.

3         On December 1, 2004, the Ninth Circuit issued its decision affirming the Court's ruling that

4    the Forest Service violated NEPA and the Court's order of injunctive relief.  See High Sierra Hikers

5    Ass'n v. Blackwell, 390 F.3d 630 (9th Cir. 2004).  The Ninth Circuit reversed the Court's grant of

6    summary judgment in favor of the Forest Service under the Wilderness Act, holding that "the

7    Wilderness Act imposes substantive requirements on an administering agency and that there are

8    triable issues of fact regarding whether the Forest Service damaged the wilderness areas."

9    Blackwell, 390 F.3d at 649.  The Ninth Circuit remanded on the Wilderness Act issue, stating:

10        The equitable relief granted by the injunction in practicality addresses most of the
          substantive violations of the Wilderness Act pending the Forest Service's
11        compliance with NEPA, as ordered by the district court. However, the injunction
          does not address remediation of any degradation that may have been caused by
12        packstock services before the 2001 Needs Assessment. The requirements of
          NEPA are procedural, to assure that the agency takes a hard look at the important
13        environmental factors, whereas the Wilderness Act sets forth substantive
          requirements to protect the wilderness. Until such time as the Forest Service
14        complies with the court's order concerning the NEPA procedural requirements,
          and thereafter reaches a decision concerning the commercial activity permissible
15        in the Wilderness Areas, the Court's interim injunction largely addresses the
          requirements of the Wilderness Act. The ultimate decision of the Forest Service
16        will remain subject to the substantive requirements of the Wilderness Act. We
          affirm the decision of the district court in granting the injunction, but reverse the
17        summary judgment with respect to the Forest Service's compliance with the
          Wilderness Act and remand to the district court for a determination of appropriate
18        relief under the Wilderness Act for remediation of any degradation that has
          already occurred.

19

20   Blackwell, 390 F.3d at 649.  The Ninth Circuit also stated:

21        The Forest Service's decision to grant permits at their pre-existing levels in the
          face of documented damage resulting from overuse does not have rational
22        validity.  In its Needs Assessment, the Forest Service listed the trailheads showing
          damage from overuse, but it did not take the next step to actually protect those
23        areas by lowering the allowed usage.  Given the Wilderness Act's repeated
          emphasis of the administering agency's responsibility to preserve and protect the
24        wilderness areas, this decision cannot be reconciled with the Forest Service's
          statutory responsibility.

25

26   Blackwell, 390 F.3d at 648.

27        At a status conference in February 2005, the parties agreed that the question of remediation

28   of past wilderness degradation should be held in abeyance until the Forest Service completed the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  court-ordered environmental analyses pursuant to NEPA by the end of 2005 and 2006.

2  Subsequently, on December 27, 2005, the Forest Service issued a Final Environmental Impact

3  Statement ("FEIS") and Record of Decision for the Trail and Commercial Pack Stock Management

4  in the Ansel Adams and John Muir Wildernesses ("2005 ROD") adopting Alternative 2- Modified

5  from the FEIS that addressed the cumulative impacts of pack stock operations in the Ansel Adams

6  and John Muir Wilderness Areas.  Administrative Record ("AR") 8880, et seq.

7       The Court held a status conference on March 7, 2006.  At that conference, the Court gave

8  Plaintiffs leave to file an amended complaint at the conclusion of the administrative appeal process

9  for the 2005 ROD.  Plaintiffs' administrative appeal of the 2005 ROD was subsequently denied.

10      On August 31, 2006, Plaintiffs filed an amended complaint challenging the 2005 ROD.  In

11 September 2006, Plaintiffs sought an extension of the injunctive relief ordered by the Court in

12 January 2002.  In November 2006, the Court declined to extend the terms of the injunction, which

13 applied pending completion by December 31, 2006 of site-specific environmental analyses for each

14 special use permittee.

15      In May 2007, Plaintiffs filed a motion for summary judgment alleging that the Forest

16 Service, through the 2005 ROD, violated the Wilderness Act and NEPA, and seeking wide-ranging

17 injunctive relief.  The Forest Service opposed that motion and filed a cross-motion for summary

18 judgment.  The cross-motions were fully briefed and the Court held a hearing on the merits on

19 September 5, 2007.  The Court deferred the issue of Plaintiffs' proposed injunctive relief pending a

20 decision on the merits.

21 **II.     Standard of Review**

22      The Court reviews challenges under the Wilderness Act and NEPA under the APA to ensure

23 that the agency has not acted in a manner that is "arbitrary, capricious, an abuse of discretion, or

24 otherwise not in accordance with law."  5 U.S.C. § 706; Blackwell, 390 F.3d at 638.  "Normally, an

25 agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has

26 not intended it to consider, entirely failed to consider an important aspect of the problem, offered an

27 explanation for its decision that runs counter to the evidence before the agency, or is so implausible

28 that it could not be ascribed to a difference in view or the product of agency expertise."  Motor

United States District Court
For the Northern District of California

1   Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43

2   (1983). The Court's role is to:

> consider whether the [agency's] decision was based on a consideration of the
> relevant factors and whether there has been a clear error of judgment.  Although
> this inquiry into the facts is to be searching and careful, the ultimate standard of
> review is a narrow one. The court is not empowered to substitute its judgment for
> that of the agency.  The final inquiry is whether the Secretary's action followed
> the necessary procedural requirements.

7   Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971).

8       The Court must determine whether the EIS was "arbitrary and capricious, an abuse of

9   discretion, or otherwise not in accordance with law."  Okanogan Highlands Alliance v. Williams,

10  236 F.3d 468, 471 (9th Cir. 2000); City of Carmel-By- The-Sea v. United States Dep't of Transp.,

11  123 F.3d 1142, 1150 (9th Cir. 1997); Western Radio Servs. Co., Inc. v. Espy, 79 F.3d 896, 900 (9th

12  Cir. 1996).  Courts apply a "rule of reason" standard, which assesses "whether an EIS contains a

13  reasonably thorough discussion of the significant aspects of the probable environmental

14  consequences."  Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001) (quoting Trout

15  Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir. 1974)); see also City of Carmel, 123 F.3d at

16  1150-51 ("the National Environmental Policy Act requires a 'reasonably thorough' discussion of the

17  environmental consequences in question, not unanimity of opinion, expert or otherwise.")  In

18  making this determination, a court must make a "'pragmatic judgment whether the EIS's form,

19  content, and preparation foster both informed decision-making and informed public participation.'"

20  Churchill County, 276 F.3d at 1071; City of Carmel, 123 F.3d at 1150-51.  "'Once satisfied that a

21  proposing agency has taken a "hard look" at a decision's environmental consequences, [our] review

22  is at an end.'" City of Carmel, 123 F.3d at 1151 (quoting Idaho Conservation League v. Mumma,

23  956 F.2d 1508, 1519 (9th Cir. 1992)).  The purpose of an EIS is to provide full and fair discussion of

24  significant environmental impacts and to inform decision makers and the public of reasonable

25  alternatives which would minimize adverse impact to the environment.  40 C.F.R. §1502.1.

26      Review under the Wilderness Act proceeds under the framework adopted in The Wilderness

27  Society:

> If the statute is clear and unambiguous, no deference is required and the plain
> meaning of Congress will be enforced.  [citations omitted].  If the statute is

4

**United States District Court**
For the Northern District of California

1
2
3
4

ambiguous, the agency's decision is entitled to <u>Chevron [U.S.A., Inc. v. Natural Resources Defense Council</u>, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)] deference if it has the force of law. [citation omitted].  If the decision does not have the force of law, it is reviewed with "respect" according to the factors set out in <u>[United States v.] Mead</u>, [533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed. 2d 292 (2001)] and <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).  [citation omitted].

5   <u>Blackwell</u>, 390 F.3d at 638-39 (citing <u>The Wilderness Soc'y v. United States Fish & Wildlife Serv.</u>,

6   353 F.3d 1051, 1059-60 (9th Cir. 2003) (<u>en banc</u>)).

7   **III.    Discussion**

8          **Wilderness Act**

9          Wilderness areas "shall be administered for the use and enjoyment of the American people in

10   such manner as will leave them unimpaired for future use and enjoyment as wilderness . . . ."  16

11   U.S.C. § 1131(a).  Wilderness is defined "in contrast with those areas where man and his own works

12   dominate the landscape . . . as an area where the earth and its community of life are untrammeled by

13   man, where man himself is a visitor who does not remain."  16 U.S.C. § 1131(c).  It is further

14   defined as an area that "generally appears to have been affected primarily by the forces of nature,

15   with the imprint of man's work substantially unnoticeable" and "has outstanding opportunities for

16   solitude or a primitive and unconfined type of recreation."  <u>Id.</u>  An agency responsible for

17   administering designated wilderness areas shall "preserv[e] the wilderness character of the area and

18   shall so administer such area for such other purposes for which it may have been established as also

19   *to preserve its wilderness character*."  16 U.S.C. § 1133(b) (emphasis added).  Regulations provide

20   that the wilderness areas will be administered "to meet the public purposes of recreational, scenic,

21   scientific, educational, conservation and historical uses; and it shall also be administered for such

22   other purposes for which it may have been established in such a manner as *to preserve and protect*

23   *its wilderness character*."  36 C.F.R. § 293.2 (emphasis added).

24          The Wilderness Act prohibits commercial enterprises in wilderness areas (16 U.S.C. §

25   1133(c)), but authorizes commercial services within wilderness areas "to the extent necessary for

26   activities which are proper for realizing the recreational or other wilderness purposes of the areas."

27   16 U.S.C. §1133(d)(5).  The Forest Service has interpreted these sections to permit pack stock

28   services.  <u>See</u> 36 C.F.R. § 293.8.  Therefore, the Wilderness Act requires that the Forest Service

5

make a finding of necessity before authorizing commercial packstock services in the wilderness areas, and then may only authorize those services to the extent necessary. Blackwell, 390 F.3d at 646-47.

The parties have somewhat different interpretations of the Wilderness Act. Plaintiffs argue that the Act requires the Forest Service to preserve the wilderness character, not simply maintain existing degraded conditions. See 16 U.S.C. § 1131(c); 36 C.F.R. § 293.2; Blackwell, 390 F.3d at 649. Defendants respond that "maintain" and "preserve" are synonyms and that there is no general restoration requirement. While Defendants may be correct that there is no automatic restoration duty in the abstract, the Wilderness Act does impose a general requirement on the Forest Service to manage wilderness areas so as to preserve the land's wilderness character. More importantly, under the specific circumstances here of the Forest Service's demonstrated failure in the past to fulfill this mandate, leading to severe degradation due to excessive commercial stock use, the Ninth Circuit recognized a need for remediation under the Wilderness Act in its instructions to this Court. See Blackwell, 390 F.3d at 648-49.

Plaintiffs also argue that the Forest Service must limit commercial services in wilderness areas to those supporting a "primitive and unconfined type of recreation." 16 U.S.C. § 1131(c). In its Manual, the Forest Service has expressed its interpretation of appropriate policy under the Wilderness Act by providing "direction for those portions of the National Forest System that are designated by Congress as units in the National Wilderness Preservation System." AR 16061. With respect to management of recreation, one of the objectives of the Forest Service is to "provide, consistent with management of the area as wilderness, opportunities for public use, enjoyment and understanding of the wilderness, through *experiences that depend on a wilderness setting*." AR 16071 (emphasis added). Specifically, the Forest Service has adopted a policy regarding commercial pack services:

> Consistent with management as wilderness, permit outfitter/guide operations where they are necessary to help segments of the public use and enjoy wilderness areas for recreational or other wilderness purposes.

AR 16071. Defendants' policy of wilderness-dependence is not taken out of context, as Defendants contend in their briefs; to the contrary, it is consistent with the objectives and policies stated in the

6

1   Manual.  Although the Manual does not have the independent force of law (see Western Radio

2   Servs. Co. v. Espy, 79 F.3d 896, 902 (9th Cir. 1996)), it represents the Forest Service's

3   interpretation of the appropriate policies under the Wilderness Act and therefore cannot simply be

4   disregarded, as Defendants would have it.

5          Moreover, the Forest Service Manual's interpretation is consistent with the mandates of the

6   Wilderness Act.  As set forth above, the Wilderness Act requires the Forest Service to limit public

7   use of commercial services in the wilderness for recreational, scenic and other authorized purposes

8   to the extent necessary and only as consistent with the overall imperative of preserving and

9   protecting the wilderness character of the land.  Defendants must reconcile the use of commercial

10  services with what the land can tolerate while remaining wilderness, so as not to elevate recreation

11  over longtime preservation of the wilderness character.  See Blackwell, 390 F.3d at 647.  The Forest

12  Service correctly recognized in its Manual that limiting recreational use to that which is wilderness-

13  dependent strikes the appropriate balance between these competing interests.   Restricting public

14  recreation by means of commercial services  "to the extent necessary" to realize "the recreational or

15  *other wilderness* purposes" of the land helps ensure its continued character as wilderness.  Whereas

16  public needs for non-wilderness dependent recreation can be met in areas outside the wilderness

17  boundaries, including other parts of the national forests, overuse for unnecessary purposes within the

18  wilderness degrades the physical environment and reduces the outstanding opportunities for solitude

19  which Congress intended wilderness areas to afford.  See 16 U.S.C. § 1131(c).

20          **The survey methodology underlying the Needs Assessment was unreliable.**

21          In an effort to determine the need for commercial services in the Ansel Adams and John

22  Muir Wilderness Areas, as required by the Ninth Circuit's decision in this case, the Forest Service

23  prepared a Needs Assessment in December 2005.  AR 8849, et. seq.  The Needs Assessment

24  concluded that the public need for commercial pack stock in the wildernesses was actually higher

25  than the level that was currently provided.  AR 8849.  The Forest Service obtained its data for those

26  conclusions by sending out a survey to certain overnight pack stock clients and by gathering

27  anecdotal evidence from pack stock operators and clients regarding day rides.  The survey was sent

28  to "individuals who identified themselves as the group leader and provided their names and

7

**United States District Court**
For the Northern District of California

addresses when receiving their wilderness permit." AR 8866. The Forest Service found that overall

need for commercial pack stock services ranged from 7,329 to 9,234 overnight clients and from

5,400 to 7,500 day ride clients. AR 8874-75. In 2004, by contrast, there were 4,015 overnight

clients and approximately 4,000 day rides. Id.

An agency's choice of methodology to assess the impact of its actions is entitled to

deference, but if the methodology is unreliable, the choice of that methodology and decisions based

thereon are arbitrary and capricious. See Ecology Ctr. v. Austin, 430 F.3d 1057, 1064 (9th Cir.

2005). To determine the trustworthiness of a survey:

> it must be shown: (1) that a proper "universe" was examined and a representative
> sample was chosen; (2) that the persons conducting the survey were experts; (3)
> that the data were properly gathered and accurately reported; and (4) that the
> sample design, the questionnaires and interviewers, as well as  the respondents,
> were unaware of the purpose of the study.

Friends of the Boundary Waters Wilderness v. Bosworth, 437 F.3d 815, 825 (8th Cir. 2006) (citing

Lutheran Mut. Life Ins. Co. v. United States, 816 F.2d 376, 378 (8th Cir.1987)). In Boundary

Waters, the Eighth Circuit squarely addressed the propriety of a Forest Service decision insofar as it

was based on survey results, and held that unreliable and inadequately explained survey data

demonstrated that reliance on the survey results was arbitrary and capricious. Boundary Waters, 437

F.3d at 825-26 (stating that the survey regarding motorized watercraft usage was deficient because:

it was sent to only thirteen property owners, only five of whom returned a completed form; there

was no evidence that the Forest Service considered whether this group would provide accurate and

representative results; the Forest Service made unsupported extrapolations regarding use based on

responses to a question that was factually incorrect; the respondents were aware of the purpose of

the survey; and the Forest Service sought information about motorcraft use going back twenty

years).

The survey at issue here suffers from fundamental deficiencies that render reliance on the

results to determine the need for commercial stock operations arbitrary and capricious. Like the

Boundary Waters survey, the survey here allowed anonymous responses without any means to verify

that the respondents were the intended recipients of the survey (unlike, for example, absentee

balloting in elections), and the recipients knew its purpose. Most strikingly, there is evidence that

**United States District Court**
For the Northern District of California

respondents took advantage of these flaws in the survey's design by copying and distributing the survey to non-recipients friendly to the packers and encouraging these individuals to return the survey anonymously in a deliberate effort to skew the results.  For example, one survey recipient typed on the survey form:

> If you know of anyone else who would like to support the packers, please spread the word and the survey with info. . . .  I would say, feel free to copy this on your printer, fill it out and mail it in anonymously.  Use the same address for the return address as the mailing address on the envelope.  That is what they have on the envelope that they mailed to me.

Supplemental Administrative Record ("SAR") SAR 2869.  Similarly, another recipient stated on the survey that:

> I will keep in touch with this issue and do <u>everything</u> I can to support the Pack Stations.  I have emailed this survey to about 30 who use the Pack Station services!

SAR 2834 (emphasis in original).  This apparent ballot-stuffing makes it impossible to rely with even minimal confidence on the accuracy of the results.

In addition, there has been no showing that an appropriate universe of respondents was chosen.  For example, the Forest Service sent out surveys to pack station clients "who identified themselves as the group leader and provided their names and addresses when receiving a wilderness permit," which totaled 537 of 4,105 overnight clients.  AR 8866.  It is unclear why only group leaders were chosen to receive the survey or why the Forest Service did not conduct further investigation to find names and addresses for those left blank.

As a whole, the survey results on which the Needs Assessment is based are unreliable, especially because the design was flawed and the results subject to manipulation.  Further, as set forth in more detail below, the survey confused "need" with the desire to pack in excessively heavy optional items that could not be carried in by even the fittest backpacker.  Accordingly, the Forest Service's reliance on the survey to calculate need was arbitrary and capricious.

**Additional flaws in the Needs Assessment**

The Needs Assessment was unreliable in other respects as well.  Defendants made sweeping statements about need based on an aging population, which it assumes will be unable to "carry a backpack and access the wilderness on an overnight trip"(AR 8869), based on only limited anecdotal

9

**United States District Court**
For the Northern District of California

1   evidence and certain very general trends.  In relying on an aging population with various disabilities

2   to show a huge increase in future need for pack services, Defendants cited the most frequently

3   occurring health conditions of elderly people.  Yet these conditions included hearing impairments,

4   sinusitis and others which are irrelevant to determining the need for pack stock services due to an

5   inability to hike with gear.  AR 8874.  At the same time, the Needs Assessment ignored

6   improvements in medical care such as hip and knee replacements.  Furthermore, the Needs

7   Assessment is unreliable in concluding that the demand for commercial pack stock trips would

8   necessarily increase commensurately with an aging population, without considering, for example,

9   the competing demand for trailer or car camping, cruises or other more sedentary vacations.

10          **The extent of the finding of need in the Needs Assessment was arbitrary and capricious.**

11          The Wilderness Act permits commercial services to the extent necessary for activities which

12   are proper for realizing the recreational or other wilderness purposes of the areas.  16 U.S.C. §

13   1133(d)(5).  The Needs Assessment identified six categories of need for pack stock services: (1)

14   persons with physical limitations that make them unable to walk and/or carry their own equipment;

15   (2) persons with equipment too bulky or heavy to carry; (3) hunters needing pack stock to haul

16   game; (4) persons desiring a wilderness "pack trip" or "day ride" experience; (5) persons able to

17   walk but affiliated with persons falling into need categories one through four and therefore included

18   as members of commercial pack groups; and (6) Native American traditional walks or gatherings

19   requiring pack stock to transport camps and those unable to walk.  AR 8863-64.

20          The Court recognizes that the Forest Service need not quantify need with complete

21   mathematical precision, but to the contrary has considerable leeway in choosing how to do so.

22   However, basic mathematical errors and the inclusion of some arbitrary categories of "need"

23   resulted in an unreliable and inflated estimate of the need for commercial pack services.  For

24   example, of the 346 of the 537 survey recipients who returned the survey, 81% "reported that they

25   could not have met the purpose of their trip in a trip outside the wilderness."  AR 8867.  Thus, 19%

26   or almost one-fifth of the respondents took commercial stock trips that were not wilderness-

27   dependent, but could have been taken outside the wilderness in less pristine areas.  Yet later in the

28   Needs Assessment and again in the ROD, the Forest Service extrapolates from the small percentage

of respondents and inexplicably converts 81% to 90% to conclude that approximately 90% of the current level of commercial use is needed to meet the public's need. Thus, it stated: "As the 2005 Commercial Pack Client survey showed, approximately 90% of the current level of commercial use is needed to meet the public's need for these services. Given the 2004 level of 4,015 commercial clients, it is estimated that 3,613 of these clients truly 'needed' the service in the context of this Needs Assessment." AR 8874; see also AR 8900 ("Nearly 90% of the groups surveyed had an unqualified obvious need for the service and the vast majority of the need was related to age or physical limitation."). If the Forest Service used its own data showing 81%, the number would not be 3,613, but 3,252.

Most of the categories of need are reasonable. Pack stock services are necessary for certain people who cannot walk or carry necessary gear. See Blackwell, 390 F.3d at 647 ("Under the broad terms of the Act, a finding that packstock was needed to provided access to those people who would otherwise not be able to gain access for themselves or their gear, can support a finding of necessity."); AR 8863 (need category 1). Further, although the Forest Service could have concluded differently, it was reasonable to find that pack services are necessary for persons able to walk but traveling with persons who cannot walk or carry certain gear. AR 8864 (need category 5).

By contrast, some of the categories of need selected by the Forest Service are arbitrarily overinclusive. Most importantly, the Forest Service's decision to count all persons with equipment too heavy or bulky to carry on foot as "in need of" commercial pack services was arbitrary and capricious. AR 8863 (need category 2). This category includes people seeking to transport items such as large radios, heavy floats and bulky furniture, that are unnecessary for wilderness travel and, indeed, incompatible with the wilderness experience of other people who seek to enjoy the "outstanding opportunities for solitude" and areas "where the earth and its community of life are untrammeled by man" that Congress mandated. 16 U.S.C. § 1311(c); AR 9921 (public comment to the DEIS regarding commercial pack groups carrying in beer cases, tables, chests and chairs, and holding "night time parties [that] are similar to a Raider tail gate party."); AR 9946 (public comment to the DEIS stating that "[i]n what is supposed to be a wilderness experience I find it very upsetting to arrive at a location and find a pack group with radios, hard liquor, tables, chairs, etc.").

11

United States District Court
For the Northern District of California

Significantly, use of these types of items in the wilderness is contrary to the Forest Service's own recognition that "[e]conomy, convenience, commercial value and comfort are not standards of management or use of wilderness."  AR 16066.  As one survey respondent stated: "Were very disappointed to see people abusing the stock services by taking in entire ice chests and lawn chairs. This requires more stock, and therefore more damage to trails and resources."  SAR 2863.  The Forest Service's argument that such items are not specifically forbidden in the wilderness area confuses the absence of a specific prohibition with the requirement of necessity; the fact that something is otherwise "legal" does not make it necessary.

Further, the Needs Assessment concludes that persons desiring a wilderness pack trip or day ride experience need commercial services.  AR 8864 (need category 4).  However, the Needs Assessment itself characterizes these activities as desires, rather than needs.  AR 8864 ("Persons *desiring* a pack trip but who lack knowledge or skills to handle or use stock in wilderness setting; Persons *desiring* a pack trip but who lack wilderness knowledge to safely and properly travel and camp in a wilderness setting, and require professional assistance to guide and advise them; Persons *desiring* a pack trip but who do not own stock or otherwise have access to suitable pack stock; Persons *desiring* a pack trip who own private stock suitable for wilderness use but who practically cannot use their own stock.") (emphasis added).  Similarly, the Needs Assessment states that "[p]ersons who may be able to walk and carry their own equipment, but elect to experience wilderness with riding and pack stock - the historical 'Sierra Pack Trip' - are also in need of commercial pack stock services in those wilderness areas."  AR 8865.  But this conclusion improperly equates "preference" with "need," especially when such pack stock trips could be made in scenic non-wilderness.  Further, the Needs Assessment does not distinguish between day rides that are necessary and those that are not (such as those that could be taken in adjacent non-wilderness forest) and therefore forecasts a very substantial but inflated increase in day rides in the wilderness.  AR 8875 (estimating an increase in level of need for day rides of 35-50%).

Defendants argue that the standard is not wilderness dependency, but instead wilderness appropriateness.  Yet as set forth above, the Forest Service Manual states that wilderness management should provide opportunities for use of the wilderness "though experiences that depend

United States District Court
For the Northern District of California

upon a wilderness setting." AR 16071. To the extent that a person simply desires a horseback ride which could be taken in scenic areas outside the wilderness, that experience is not wilderness-dependent. Cf. AR 8871 ("Likewise, there is a need for a scenic destination for the trip."). By equating desire with need, Defendants have not established the necessity for the existing level of all day rides in the wilderness, much less the increased number of rides projected in the Needs Assessment (5,400 to 7,500 clients, compared to the current level of 4,000 or an increase of from 35% to 88%).

The Needs Assessment also did not adequately analyze the need for spot and dunnage trips, which constitute 80% or more of the overnight services provided by packers. AR 8859. These trips are generally used by people who are physically capable of hiking, but who want their gear packed in or want to go deeper into the wilderness. While Plaintiffs argue to the contrary, Defendants are correct that many may need stock support to make an initial ascent or begin their trip with full packs before consuming food. However, there is evidence that some spot and dunnage trips are used by people who want to evade the trailhead quotas, rather than by those who need them. AR 14227 (report to Congress that "prospective backpackers who are unable to get permits enter on commercial stock permits and then continue their trips backpacking."); AR 14892 (stating that "[a]ll the pack stations quietly admit that the daily quotas for hikers has benefitted them since it has increased their business."); AR 14891 (ranger complaint about this practice); SAR 2850 (survey respondent used pack services because permit not otherwise available). The Needs Assessment is deficient in failing to assess this issue.

The Needs Assessment is also arbitrary and capricious in assuming sharp increases in future use of commercial packstock services without reconciling this projection with the long-term downward historical trend. Specifically, the Needs Assessment estimates that demographic trends will result in a 75-100% increase in future need for commercial pack services and a 35-50% increase in future need for day rides. AR 8873, 8875. Yet it does not acknowledge, much less justify, the fact that this future projection represents an abrupt about-face from the historical trend over more than five decades. AR 8852 ("Since the 1950s, the number of pack stations has decreased considerably. Likewise, the number of stock and clients serviced has also decreased. . . . This

**United States District Court**
For the Northern District of California

1  downward trend continued into the 1990s."); 8853 ("Since the 1950s, there has been a trend towards

2  fewer pack stations, commercial stock in the wilderness areas, and clients utilizing the services.");

3  8855 ("This represents an average of 925 fewer clients or a 22 percent reduction between the 1970s

4  and 2000.").   Defendants do not even attempt to explain this sharp contrast between historical

5  experience and their future projection.

6  Finally, Defendants rely on anecdotal evidence to conclude that there is a "sizeable

7  percentage" of unmet need consisting of people who are unwilling or unable to pay the costs for

8  packstock services.  AR 8872 ("Furthermore, there is likely a sizeable group of individuals who

9  need commercial packing services and fit into a need category but are unable to afford the service. . .

10  . It is impossible to determine the number of people that are unable to afford the service each year

11  and 'needed' the service to access the wilderness.  Given that nearly 90% of current use fits into one

12  of the Need Categories, it is logical to assume a sizeable percentage of individuals are unwilling or

13  unable to pay for the escalating price of these services.").  This category of purported need is

14  difficult to understand because the task is to determine the need for *commercial* services, as opposed

15  to hypothetical governmentally-provided, nonprofit or subsidized services.  The Forest Service does

16  not explain why it does not employ the usual definition of demand for commercial services as

17  willing buyers who can afford to and choose to buy the services at the price offered.

18  **The Destination Management strategy does not adequately address the preservation of
   wilderness character and improperly allows harmful spikes in use.**

19

20  Destination management uses destination quotas rather than trailhead quotas to control

21  frequency of use of wilderness destinations.  AR 7934.  Destination quotas limit the total number of

22  trips in a given year by each commercial stock operator to specified destinations "to meet the desired

23  resource and experiential condition for the area, considering the recreation category and the resource

24  capacity of the destination."  AR 7509; AR 7934 ("Destination quotas provide site-specific spatial

25  controls on commercial pack stock operators."); see also AR 8927-8932 (destination management is

26  an adaptive management approach to "managing resources where the planning process includes

27  recognizing the uncertainty in existing knowledge related to the resource being managed, and treats

28  management actions as experiments or as hypotheses to be tested using monitoring specifically

designed for the particular action.").  The 2005 Plan also imposes a "stock-at-one-time-in-

14

United States District Court
For the Northern District of California

1  wilderness" standard to complement the destination management scheme. "Stock-at-one-time-in-

2  wilderness" means the maximum number of stock per pack station that are allowed in the wilderness

3  (at any and all destinations combined) on any given day. AR 7512. The numbers were "derived

4  from an analysis of recent stock use on trails, current resource concerns, visitor capacity

5  considerations, cumulative impacts and management objectives." Id.

6      Destination management, which focuses on the number of trips to particular places in the

7  wilderness each year but not when those trips are taken, can be an appropriate tool if combined with

8  other safeguards that adequately address the temporal issue of excessive simultaneous use by

9  multiple packers.  As set forth in the 2005 Plan, however, there are several aspects that run afoul of

10  the Wilderness Act.  First, as noted above, the Ninth Circuit has already cautioned that allowing pre-

11  existing levels of use from the 2001 Plan to continue in light of the demonstrated degradation that

12  usage has already caused to the wilderness environment is irrational:

13          The Forest Service's decision to grant permits at their pre-existing levels in the
           face of documented damage resulting from overuse does not have rational
14          validity.  In its Needs Assessment, the Forest Service listed the trailheads showing
           damage from overuse, but it did not take the next step to actually protect those
15          areas by lowering the allowed usage.  Given the Wilderness Act's repeated
           emphasis of the administering agency's responsibility to preserve and protect the
16          wilderness areas, this decision cannot be reconciled with the Forest Service's
           statutory responsibility.
17
18  Blackwell, 390 F.3d at 648. Yet, under the destination management scheme adopted in the plan, the

19  allocation of trips to each destination is largely unchanged from the excessive levels of 2001-2004,

20  and "overall use remains relatively constant." AR 7934.

21      Second, the destination management plan allows for significantly increased commercial

22  packstock use in some parts of the wilderness, including areas previously recognized by the Forest

23  Service as already heavily damaged from excessive stock use.  In addition, some pack stations will

24  have more stock allowed in the wilderness than their allocated or reported actual stock use in

25  previous years. AR 14071-72. For example, three pack stations -- Rock Creek, Pine Creek and

26  McGee -- use the Hilton Lakes destination, which the Forest Service has previously categorized as

27  already seriously degraded. AR 1207; AR 1051-54 (destinations such as Hilton Lakes labeled as

28  "red" if there are strong concerns about environmental resources such that current use affected

resource quality).  The EIS claims that pack stock use in the Hilton Lakes area would be "reduced

1   slightly." AR 8009.  Plaintiffs point out, however, that the 2005 Plan allocates 60 spot and dunnage

2   trips and up to 25 full service trips to Hilton Lakes, or 85 combined, which exceeds the use from

3   2001 to 2004 which ranged from 38 to 67 packstock trips of both types combined (with an average

4   of 53).  AR 9042-44.  Defendants do not dispute Plaintiffs' numbers, but argue that the total number

5   of trips theoretically possible is unlikely under destination management.  AR 8009.

6       Other examples include Glacier Pack Train, which had historic use of 25 stock established by

7   a 1982 Operating Plan, and an allocation and reported use in 2001 of 30 stock for all uses.  AR

8   14071. Yet its new stock-at-one-time limit under the 2005 Plan is 35 stock.  Id.  Lost Valley Pack

9   Station had historic use of 14 stock established by a 1997 written communication, 2001 allocated

10   use of 20 stock, and 2001 actual use of 17 stock.  AR 14072.  Yet its new stock-at-one-time limit

11   under the 2005 Plan is 25 stock.  Id.

12       Further, with respect to Glacier Pack Train, the maximum number of trips under the 2005

13   Plan exceeds the maximum reported use from 2001 to 2004.  The number of trips allocated under the

14   2005 Plan is 166 (AR 14077; 9058-60), whereas the maximum number of trips per year from 2001

15   to 2004 was 161, with a range from 81 to 161.  Id.  Defendants argue that comparing actual use to

16   authorized use is somehow improper.  But comparing authorized use to past actual use makes sense:

17   there is no reason to authorize an increase over past actual use levels when that actual use exceeded

18   the area's capacity, causing degradation of the wilderness.

19       Defendants also rely on the bare statement in the EIS that operators are not likely to use all

20   trips assigned to them in one year, while the limit on stock at one time helps assure that use remains

21   similar to past and recent levels of use.  AR 7935.  But the EIS does not provide any basis for the

22   assumption that operators will not use their stock quotas to visit the same popular places as in the

23   past, perpetuating the degradation from prior excessive stock use.  Further, even if pack stations do

24   not use their maximum allocation, there is nothing in the Plan to preclude all pack stations from

25   operating at the maximum trip and stock-at-one-time levels.

26       Third, the 2005 Plan improperly allows spikes in use in violation of the Wilderness Act.

27   Spikes result from concentrated use and are defined as "high, short duration use levels by

28   commercial operators."  AR 1376.  Spikes cause intensified harm to the wilderness such as "the

16

**United States District Court**
For the Northern District of California

creation of new campsites since all existing sites may be occupied, enlarging of existing sites since large groups may be a cause of the spike event, and loss of solitude since greater numbers of people are encountered in travel and while camping when spikes occur." Id.

Almost all visits to the two wildernesses at issue occur in the summer, especially during weekends, holidays and the first two weeks of August. AR 7697, 8857, 8872. The short summer season in these high mountain areas during which travel is not obstructed by snow and other weather conditions compresses most use by humans into a very short time frame each year. Before trailhead quotas were introduced, concentrated use resulted in harmful spikes in use by hikers and packers. In 1998, for example, the Forest Service documented heavy overuse at Hilton Lakes. AR 14308. To prevent spikes, the Forest Service implemented trailhead quotas in the 2001 Plan. AR 1376 ("Trailhead quotas on commercial use were determined to be the best mechanism to address adverse impacts caused by spikes."); 9487 ("establishing trailhead quotas is necessary to reduce resource impacts caused by peak use periods and to help distribute use over time and space for a quality wilderness experience"). The goal was to generally eliminate large spikes that had been a source of previous negative impacts on the wilderness. AR 1198. The trailhead quotas worked; indeed, the Forest Service touted them as best suited to preventing the severe disruptions to the experience of solitude in the wilderness caused by spikes as well as concentrated physical impacts such as trampling. AR 7926 (trailhead quotas are "preventing spikes in use"); 7925 ("Spikes in trailhead use typically occur on the holiday weekends, and in the first two weeks of August, at popular well-known destinations. . . . This current quota mechanism is best for reducing the experiential impacts of crowding by controlling the sheer number of people allowed to enter the wilderness area each day."); 927 (quota system feasible for packstock operators).

In abandoning trailhead quotas in the current FEIS, Defendants argue that the quotas were not effective in controlling spatial distribution of use because after visitors enter at a particular trailhead under a quota, they may disperse to any area accessible by that trail and others with which it intersects. AR 7925-26 ("The trailhead quota does not effectively control the spatial distribution of use. With less effective control of spatial distribution, there is higher probability that ecological values will be impacted. With trailhead quotas, the frequency of use or number of times a

destination gets used is not controlled."). But the destination quotas and stock-at-one-time limitations contained in the 2005 Plan also allow visitors to use one-way spot and dunnage trips as a starting point to hike wherever they want to in the wilderness. The same is true for two-way spot and dunnage trips to the extent that people can disperse once they are dropped off.

Moreover, even though Defendants themselves previously determined that trailhead quotas worked to limit temporal spikes, Defendants jettisoned the quotas and now rely on the stock-at-one-time limitation instead to prevent spikes in use. AR 7935 ("Operators are not likely to use all the trips assigned to them each year. Some years destinations may never get used. Other years, destinations may receive maximum use. By imposing a limit on the number of stock each operator can have in the wilderness at one time ensures there are no spikes in use and use levels will remain similar to recent and past levels of use."). Plaintiffs argue persuasively that the stock-at-one-time limitation does not adequately prevent spikes in use and allows an excessive number of stock in the wilderness at any one time. For example, Plaintiffs note that allowable stock in John Muir and Ansel Adams is 915 head (AR 7512-13), which can be used wherever operators choose among 189 destinations. AR 8885. Thus, at Hilton Lakes, the three operators who serve this area and have 200 total stock could use all of their stock at one time in the Hilton Lakes area, such as the popular first week in August, which would create a harmful spike. As another example, Plaintiffs point to Frontier Pack Trains, which conducts trips almost exclusively on the Rush Creek Trail (AR 7964), and is allowed 75 stock each day, and thus has the potential to use over 1000 head of stock on that trail over a two-week period. AR 7965. Defendants argue that historical use patterns differ, and Frontier is only allocated 85 spot and dunnage trips, so it is unlikely that it would take its maximum stock out over a two week period, thereby using up nearly half of its annual spot and dunnage trips.

Yet Defendants fail to acknowledge that the peak season for visitors is very short and concentrated, so pack stations may well use most if not all of their annual destination allocations and stock-at-one-time during the busiest times, that is, holidays and the first two weeks of August, when spikes have historically occurred at the most popular locations. Defendants also point out that spikes are not expressly prohibited by the Wilderness Act. But here, the Forest Service has previously found that spikes in stock use caused degradation in these particular wilderness areas --

**United States District Court**
For the Northern District of California

1    damage from which it will take years to recover.  Yet the Forest Service's Plan allows more harmful

2    spikes to occur.  For all of these reasons, the Destination Management plan runs afoul of the

3    Wilderness Act.

4          Moreover, Plaintiffs argue that the adaptive management strategy allows improper

5    modifications of standards and limits contained in the ROD without going through the process of

6    formal plan amendment or compliance with NEPA.[2]  See Klamath Siskiyou Wildlands Ctr. v.

7    Boody, 468 F.3d 549, 557 (9th Cir. 2006) (rejecting BLM plan that allowed BLM to make changes

8    to the plan without meeting its regulatory duty to formally amend the plan where plan said that it

9    "contemplated a wide swath of changes.").  However, there is no indication at this point that the

10   Forest Service intends to avoid its NEPA obligations in the future if and when changes are made.

11   See In re Operation of the Missouri River Sys. Litig., 363 Forest Service. Supp. 2d 1145, 1164 (D.

12   Minn. 2004) ("Absent evidence that the adaptive management process actually results in the Corps'

13   evasion of NEPA obligations, the Court declines to declare this approach invalid.").  To the

14   contrary, Defendants represent that if a management change requires NEPA analysis, the Forest

15   Service will engage in that analysis.  See Defs.' Cross-Mot. for Summ. J. at 35:4-9.  Therefore, the

16   adaptive management strategy as currently set forth does not violate NEPA.

17        **The Forest Service violated NEPA by failing to take a hard look at the harm to the
          Yosemite Toad caused by commercial pack stock operations.**

18

19        Plaintiffs argue that the EIS violates NEPA and the Wilderness Act with respect to the

20   Yosemite Toad.  They argue that Defendants violated NEPA by failing to consider a reasonable

     alternative to protect the Yosemite Toad, and by failing to take a hard look at the harm to the Toad
21
     resulting from packstock use not only in their breeding areas, but elsewhere.  They also contend that
22
     Defendants violated the Wilderness Act by determining that packstock grazing will have negligible
23
     impacts on the Yosemite Toad.
24
          Defendants respond that Plaintiffs are barred by the doctrines of exhaustion and waiver from
25

26   _____

27        [2]      Defendants argue that Plaintiffs' complaints about the adaptive management plan are
     premature because the ROD only establishes an overall scheme, and actual permitting decisions will be
28   the subject of the 2006 RODs.  Plaintiffs respond that their appeals of the 2006 RODs were denied in
     May.  Moreover, the 2005 ROD states that the 2006 planning process "will not revisit decisions made
     in this ROD."  AR 8923.  Therefore, Plaintiffs' arguments are ripe.

United States District Court
For the Northern District of California

1  raising any claims related to upland habitat of the Yosemite Toad, as opposed to the toad's breeding

2  habitat, because Plaintiffs failed to raise this issue in their comments to the DEIS or in their

3  administrative appeal.  See Department of Transp. v. Public Citizen, 541 U.S. 752, 764-65 (2004)

4  ("Persons challenging an agency's compliance with NEPA must 'structure their participation so that

5  it ... alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give

6  the issue meaningful consideration.") (quoting Vermont Yankee Nuclear Power Corp. v. Natural

7  Res. Def. Council, 435 U.S. 519, 553 (1978)); Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d

8  957, 965 (9th Cir. 2002) ("The Administrative Procedure Act requires that plaintiffs exhaust

9  available administrative remedies before bringing their grievances to federal court.").

10       In their comments to the DEIS, Plaintiffs stated that "stock animals should be prohibited

11  entirely from entering occupied breeding habitat for Yosemite Toads."  AR 11149.  In their

12  administrative appeal, Plaintiffs stated that the FEIS would "allow grazing by commercial packstock

13  to continue in degraded areas, and in areas that are habitat for sensitive species (such as Yosemite

14  Toad), relying largely on commercial operators to monitor and report use."  AR 14034.  They also

15  stated that the FEIS ignored the concern of resource specialists "about allowing stock to access

16  Merriam Lake and Meadow using a steep, unconstructed and improperly located trail, and about

17  permitting grazing in a meadow that is so wet that it never reaches range readiness and is occupied

18  Yosemite Toad habitat."  AR 14082.  Plaintiffs further commented that "one key concern is that the

19  FEIS/ROD would allow grazing in sensitive wetland areas without adequate controls to prevent

20  significant impacts from grazing and trampling, including but not limited to adverse impacts to

21  sensitive and seriously declining species, such as Yosemite Toad."  AR 14111.  Accordingly,

22  Plaintiffs sufficiently raised the issue of Yosemite Toad habitat in their comments and in the

23  administrative appeal.  Even though they did not distinguish between breeding and upland rearing

24  habitat, the Forest Service itself believes those habitats are the same.  See Defs.' Reply at 30:2-4

25  ("While the EIS and ROD speak in terms of excluding from 'breeding habitat,' the fact is that

26  breeding habitat and rearing habitat are one and the same thing - the wet portions of the meadows

27  with standing water or saturated soil.") (citing AR 6249 (referring to wet habitat for, and timing of,

28  breeding and rearing).  Accordingly, Plaintiffs are not barred from raising the issue of upland rearing

1   habitat here.

2       The Yosemite Toad is found only in the Sierra Nevada, and 90% of its current habitat is in

3   the John Muir and Ansel Adams wildernesses at issue here and, as its name suggests, in Yosemite

4   National Park.  AR 7347, 11878.  The Yosemite Toad population has declined precipitously; it is no

5   longer present in 50% of the locations that it once occupied, and local populations have dwindled in

6   the sites where it still lives.  AR 8148, 17450.  In 2002, the Fish & Wildlife Service determined that

7   the Yosemite Toad is warranted for listing under the Endangered Species Act and identified

8   packstock as a cause of its decline.  AR 17447, 17450-51; see also Blackwell, 390 F.3d at 642, n. 5

9   ("Livestock activities are cited as a factor in the decline of the Yosemite Toad."); AR 7348 (egg

10  masses, tadpoles and small toads are highly vulnerable to trampling from packstock); AR 7349

11  (packstock may collapse burrows where toads seek cover or hibernate); AR 7392 (toad metamorphs

12  are vulnerable to trampling); AR 2356 (wet habitat is vulnerable to trampling); AR 7393 (packstock

13  grazing reduces vegetative cover).

14      The 2005 Plan allows packstock grazing in at least thirty-six meadows with Yosemite Toad

15  breeding habitat.  AR 7809 (of 267 meadows that have Yosemite Toad breeding habitat,

16  approximately 81 breeding sites overlap with commercial packstock operations, primarily the

17  grazing aspect of the operations).  The Plan prohibits packstock from entering unsuitable or critical

18  areas and relies on operators to manage their packstock to avoid entry into those areas.  AR 7513

19  ("No stock entry or use will be allowed in areas identified as critical or unsuitable.  The stock user is

20  expected to manage stock to avoid stock entry.  Operators planning on using meadows with

21  identified critical areas, must describe the techniques they plan to use to avoid entry.  This must be

22  approved in the annual operating plans.").  Nonetheless, the Forest Service determined that it is

23  "likely packstock could drift into breeding areas on occasion even under close management."  AR

24  7398.

25      Defendants argue that this exclusion provision satisfies their obligation to incorporate

26  mitigation measures to offset any environmental damage.  See 40 C.F.R. § 1502.16(High Sierra

27  Hikers) (stating that an EIS "shall include discussions of . . . means to mitigate adverse

28  environmental impacts."); Environmental Protection Information Center v. United States Forest

United States District Court
For the Northern District of California

1   Service, 451 F.3d 1005, 1015 (9th Cir. 2006) (upholding analysis of mitigation measures that had

2   been incorporated into the project itself).  The Forest Service prepared a Biological Evaluation

3   ("BE") to assess packstock entry into areas that support the Yosemite Toad, which concluded that

4   "the effect of grazing and trail use on the persistence of toad population in any of the meadows

5   where pack stock use overlap could occur in the future is unknown."  AR 7391.  Yet the FEIS states

6   that impacts of packstock on the Yosemite Toad would be negligible.  AR 8418-22 ("The effects of

7   implementation of Alternative 2-Modified destination use regulating system for commercial pack

8   stock operations would likely have no substantive effects on Yosemite toads and their breeding

9   habitats, similar to Alternative 1.").  Moreover, there is evidence that the BE "entirely failed to

10  consider an important aspect of the problem."  See, e.g., Martin Decl. ¶ 6 (study "almost completely

11  ignored the habitat needs of subadult and adult Yosemite Toads under the false assumption that the

12  breeding areas are primary zones of grazing impacts.").

13          "One important ingredient of an EIS is the discussion of steps that can be taken to mitigate

14  adverse environmental consequences."  Robertson v. Methow Valley Citizens Council, 490 U.S.

15  332, 351 (1989) ; see also Neighbors of Cuddy Mountain v. United States Forest Service, 137 F.3d

16  1372 (9th Cir. 1998) ("Mitigation must be discussed in sufficient detail to ensure that environmental

17  consequences have been fairly evaluated.").  At the same time,

18              There is a fundamental distinction . . . between a requirement that mitigation be
            discussed in sufficient detail to ensure that environmental consequences have
19          been fairly evaluated, on the one hand, and a substantive requirement that a
            complete mitigation plan be actually formulated and adopted, on the other. . . . it
20          would be inconsistent with NEPA's reliance on procedural mechanisms-as
            opposed to substantive, result-based standards-to demand the presence of a fully
21          developed plan that will mitigate environmental harm before an agency can act.

22
23  Methow Valley, 490 U.S. at 352-53.

24          In Okanogan Highlands Alliance v. Williams, 236 F.3d 468 (9th Cir. 2000), the court

25  determined that the discussion of mitigation measures was extensive and satisfied NEPA.

26  Specifically, the EIS described mitigation measures for a gold mine project, including

27  comprehensive monitoring, methods to prevent overflow from the project from affecting water

28  quality and further methods for achieving water quality standards if initial methods fail.  See

United States District Court
For the Northern District of California

1   Okanogan, 236 F.3d at 476-77.  Further, each mitigation process was evaluated and given an

2   effectiveness rating.  Id.

3          By contrast, the EIS in Cuddy Mountain contained only a "perfunctory" discussion of

4   mitigation as follows:

5          [S]mall increases in sedimentation and other effects of logging and road
           construction in Grade and Dukes creeks would be mitigated by improvements in
6          fish habitat in other drainages.... Even minor improvements in other drainages,
           such as Wildhorse River or the Weiser River, would affect more fish habitat than
7          exists in Grade and Dukes creeks. (See Forest Plan, page IV-38 for a list of
           offsetting mitigation projects.).  Offsetting mitigation would include such projects
8          as riparian enclosures (fences around riparian areas to keep cattle out) and fish
           passage restoration (removing fish passage blockages). These activities can be
9          effective but cannot be quantified with present data.

10  Neighbors of Cuddy Mountain, 137 F.3d at 1380 ("A mere listing of mitigation measures" is not

11  enough to satisfy NEPA).   The Ninth Circuit determined that this cursory discussion was

12  inconsistent with the hard look the Forest Service was required to take pursuant to NEPA.  See id. at

13  1381 (". . . the Forest Service did not discuss which (or whether) mitigating measures might

14  decrease the increased sedimentation in the three creeks affected by the timber sale.  In fact, we read

15  the EIS as suggesting that the Forest Service did not even consider mitigating measures for the

16  creeks actually affected by the sale, apparently because the Forest Service believes that mitigating

17  measures elsewhere in Payette could 'compensate' for the harms caused to the three creeks in the

18  Grade/Dukes area.  It is also not clear whether any mitigating measures would in fact be adopted.

19  Nor has the Forest Service provided an estimate of how effective the mitigation measures would be

20  if adopted, or given a reasoned explanation as to why such an estimate is not possible. . . . The

21  Forest Service's broad generalizations and vague references to mitigation measures in relation to the

22  streams affected by the Grade/Dukes project do not constitute the detail as to mitigation measures

23  that would be undertaken, and their effectiveness, that the Forest Service is required to provide.").

24         In this case, the Forest Service argues that the prohibition on grazing in sensitive areas is the

25  mitigation measure.  See AR 7513 ("No stock entry or use will be allowed in areas identified as

26  critical or unsuitable.  The stock user is expected to manage stock to avoid stock entry.  Operators

27  planning on using meadows with identified critical areas, must describe the techniques they plan to

28  use to avoid entry."); see Environmental Protection Information Center v. United States Forest

*Service*, 451 F.3d 1005, 1015 (9th Cir. 2006) (upholding analysis of mitigation  measures that had been incorporated into the project itself.).  In Environmental Protection Information Center, however, the agency provided specific and detailed information on how the project would be conducted to reduce its environmental impacts, including ongoing monitoring.  See Environmental Prot. Info. Ctr., 451 F.3d at 1015-16 ("In short, given the specificity of the protection measures, the analysis of the environmental impacts with these measures in place, and the provision for ongoing monitoring to ensure compliance, USFS has taken the requisite "hard look" at the Project's environmental consequences.").  By contrast, here, the Forest Service has failed to provide specific information regarding mitigation measures to protect Yosemite Toad habitat.  Instead, the Forest Service simply assigns responsibility for stock management to the packstock operators despite the fact that it is "likely packstock could drift into breeding areas on occasion even under close management."  AR 7398.  Drift fences are mentioned in the FEIS (AR 7514), but there is no discussion of their effectiveness in preventing stock incursion on Yosemite Toad habitat.  At the hearing, Defendants argued that electric fencing could prevent packstock from infringing on the Toad habitat, but when questioned by the Court, could not explain how such electricity could be supplied in the wilderness area either as a practical matter or consistent with the primitive wilderness character of the areas.

The discussion of mitigation measures here is more like the perfunctory analysis in Cuddy Mountain than the extensive evaluation in Methow Valley or Okanogan.  Relying on the packstock operators to monitor their stock to exclude them from breeding habitat despite the reality that even close management will not prevent drift of stock into that sensitive habitat does not constitute an adequate discussion of mitigation measures or the requisite hard look at this issue.

Further, the Plan fails to consider other reasonable alternatives under NEPA to protect the Yosemite Toad.  Plaintiffs point to a statement by an agency wildlife biologist in 2001 noting that the relatively small number of meadows where packstock grazing overlapped with remaining habitat for the Toad, and recommending that the Forest Service "exclude grazing throughout the entire season in Yosemite Toad breeding and rearing habitat."  SAR 2356.  Plaintiffs argue that Defendants did not consider this alternative, and instead asked packstock operators where they wanted the stock

to graze.  AR 7524 ("grazing zones . . . are based on areas requested for grazing by the commercial

pack operators.").  The Forest Service considered eliminating all commercial pack use from the

wilderness in Alternative 5 in the FEIS, but found that although it "would have a long-term

beneficial effect," the "extent and magnitude of this effect is unknown in terms of how it would

actually affect toad use or breeding meadows and population dynamics and viability.").

The fact that the Forest Service acknowledged the long-term benefits but failed to determine

how those benefits would actually affect the Toad in a number of ways reinforces the conclusion that

the Forest Service failed to take a hard look at the impacts to the Yosemite Toad pursuant to NEPA.

Accordingly, the Court need not reach the Plaintiffs' argument that the Forest Service also violated

the Wilderness Act on this issue.[3]

**The Forest Service failed to take a hard look at water quality issues in the FEIS and allowed further degradation through increased grazing in already impacted areas in violation of the Wilderness Act.**

Plaintiffs contend that the Forest Service violated NEPA and the Wilderness Act by failing to

adequately address water quality issues arising from packstock use.  It is undisputed that the Forest

Service did not collect quantitative data regarding water quality in the wilderness areas.  Defendants

argue, however, that to comply with NEPA, they need only take a hard look at environmental

consequences and need not necessarily collect quantitative data.  Further, they argue that since water

quality was an insignificant issue, more extensive NEPA analysis was not necessary.   AR 8236-37

("water-borne bacteria and nutrients from pack stock manure is a minor concern over most areas of

the wilderness, although the risk is not understood very well."); AR 8238 (concluding based on

literature review that it is "unknown" whether the quantity and extent of stock manure deposited in

water and carried by runoff is "enough to cause measurable water quality degradation

wilderness-wide or locally," and that "it is not likely a significant issue" because previous water

quality sampling in other wilderness areas did not indicate degraded water quality); see also AR

---

[3]  Plaintiffs' recasting of the Yosemite Toad issue as a Wilderness Act claim seems to attempt to import the requirements of the Endangered Species Act (16 U.S.C. § 1531-1544), which is not at issue here because the Toad has not been listed, into the Wilderness Act.  Plaintiffs acknowledged that they were not aware of any authority for addressing endangered species issues under the Wilderness Act.

1   7773-75.

2       Defendants further contend that the management of meadows as required by the FEIS is

3   consistent with the 2001 Wilderness Plan and the Sierra Nevada Forest Plan Amendment Riparian

4   Conservation Objective, both of which require only that the Forest Service ensure that the meadow

5   habitats remain at Proper Functioning Condition.[4]  AR 8239.  The FEIS specifies that meadows with

6   streams that are non-functional or functional at risk with a downward trend are to be rested.  AR

7   8254-55 ("Meadows found to be unsuitable for grazing, outside of designated grazing zones, or that

8   have currently unacceptable impacts would be closed to use and only meadows found to be suitable

9   for grazing would be open for grazing.").

10      The Environmental Protection Agency ("EPA") commented to the Forest Service that "a

11  detailed description and commitment to monitoring measures and enforcement is not provided in the

12  DEIS.  The lack of this information is of significant concern."  AR 11871.  Further, the EPA stated

13  that it was "concerned by the minimal water quality and ecological improvements provided by the

14  proposed action alternatives."  Id.  Moreover, the EPA expressed its concern that the FEIS affords

15  only "minimal improvement in identified degraded conditions in meadows, streams and trails."  AR

16  12046.

17      The Court shares the EPA's concerns on these issues.  Moreover, instead of resting degraded

18  areas as stated in the FEIS, Plaintiffs point out that the Plan permits grazing in meadows along

19  functional-at-risk streams whose trend is unknown.  AR 12203; 9051 (permitting some grazing in

20  Lower Hopkins Basin where there are functional at risk streams with unknown trend).  The Plan

21  does not preserve the wilderness character of the area insofar as it allows this grazing, much less

22  take into account remediation of past degradation, which this Court was instructed to do in

23  Blackwell.  For example,  the EPA raised the issue of grazing in Jackass Meadow (AR 12046),

24  which has "severe hydrologic function alteration," yet the Plan increases permissible stock grazing

25  ———————————————

26      [4]     Under the Proper Functioning Condition protocol, streams are evaluated for their
    functional condition, and given a rating of properly functioning, functional-at-risk with an upward trend,
    functional-at-risk with no apparent trend and functional-at-risk with a downward trend.  See AR 8239,
27  8246.  Of the 230 meadows evaluated in the FEIS, 93 were found to have "at least slight hydrologic
    function alteration" and 17 have severe hydrologic function alteration.  AR 8257.  Twenty-two percent
28  of these meadows may show recovery, 65% will remain in the same altered condition, and 13% could
    have a downward trend.  AR 8257.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

to up to 2,025 stock nights per year in the meadow, up from around 400.  AR 8257.  The FEIS states that grazing in Jackass Meadow "could increase the extent of hydrologic function alteration beyond that being caused by dam operations."  AR 8257-58.  The FEIS states that if the meadow shows a major increase in hydrologic function alteration, the grazing numbers will be reduced (AR 8258), but by then it will be too late.  Allowing grazing in a meadow that already suffers severe hydrologic function alteration is inconsistent with Defendants' obligation under the Wilderness Act.  Defendants' conclusion that packstock should not be restricted from all areas with degraded streams and meadows is contrary to the Wilderness Act.  Moreover, Defendants' examination of water quality issues, including monitoring and enforcement, is inadequate in light of the EPA's significant concerns, and is irrational to the extent that it permits grazing in meadows with streams that should be rested pursuant to the Plan.  Thus, Defendants failed to take a hard look at water quality issues in violation of NEPA.

**Plaintiffs failed to show that they exhausted their administrative remedies with respect to grazing by domestic livestock.**

The FEIS states that: "Past and present grazing from production livestock and pack stock is thought to be the largest contributor to meadow hydrologic function alteration."  AR 8254.  Plaintiffs argue that the FEIS does not consider the impact of the six active domestic livestock grazing allotments in the wildernesses or the cumulative effects of the livestock grazing and commercial grazing.  AR 7338.

However, because Plaintiff failed to raise this issue in the comments to the DEIS (AR 11079-160) or in their administrative appeal of the ROD (AR 14011-133), they are barred from doing so here.  See Department of Transp. v. Public Citizen, 541 U.S. 752, 764-65 (2004) ("Persons challenging an agency's compliance with NEPA must 'structure their participation so that it ... alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration.") (quoting Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 553 (1978)); Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 965 (9th Cir. 2002) ("The Administrative Procedure Act requires that plaintiffs exhaust available administrative remedies before bringing their grievances to federal court.").

//

1   //

2   **The Forest Service's change to the campfire policy was arbitrary and capricious in violation of the Wilderness Act and NEPA.**

In the 2001 Plan, the Forest Service prohibited all campfires above 10,000 feet in the north and 10,400 in the south.  AR 7929.  In the 2005 Plan, the Forest Service proposed to modify the elevational fire closure boundary: (1) to allow fires for all visitors in areas where a certain amount of firewood is available; (2) to allow charcoal fires in areas closed to wood fires; and (3) to allow on a case-by-case basis wood campfire use by commercial pack stations in closed areas using wood packed in from an approved source.  AR 8886, 8903-04.  These proposals generated strong opposition from Yosemite National Park and Sequoia and Kings Canyon (SEKI) National Parks because of the likely harmful environmental consequences.  For example, regarding the proposal to allow operators to pack in firewood, the Superintendent of the Yosemite National Park wrote:

> We feel it would have serious ecological and experiential impacts because it is unlikely that use of the fires in the closed areas could be limited only to the intended parties with packed-in wood.  Moreover, it is possible that non-native fungal pathogens, insects, seed and other invasives might be brought in with the wood.

AR 10174.  The Acting Superintendent of the Sequoia and Kings Canyon National Parks wrote, regarding the practice of packing in charcoal and firewood:

> We strongly oppose the packing in of firewood or charcoal to areas where fires are generally prohibited. . . .  By bringing in firewood, there is a risk of importing non-native, and potentially harmful, pathogens and materials, e.g., weed seeds.  There is also a compliance issue in that coals/ashes may be dumped counter to instructions to remove these materials. . . .  This practice would have other effects as well, including requiring additional stock to carry the wood/charcoal (which would increase impacts and costs to clients), the false impression that fires are allowed in what are supposed to be 'closed' areas to other user groups, and the potential dissatisfaction of those other user groups who subject themselves to citations and may feel that a double-standard exists for the benefit of a commercial entity.

AR 11864-65.

Further, the Forest Service itself previously determined that allowing fires made with packed-in wood did not alleviate the harm caused by such fires to the wilderness.  AR 846 (2001 FEIS stating: ". . . packing in firewood did not lead towards a reduction of impacts" in closed areas); AR 1382 (2001 ROD stating: "Permitting firewood and charcoal to be packed in would allow fires without knowledge of where the fuels came from, causing confusion for visitors and rangers alike.

28

United States District Court
For the Northern District of California

Rangers trying to enforce the closure would have difficulty determining if a campfire is entirely made up of packed-in wood.  Visitors may misunderstand the closures if they see campfires occurring in closed areas.  This, we believe, could lead to compliance problems and equity issues, . . . .").

Defendants defend the change in campfire regulation by pointing to the adaptive management strategy, which provides tools for allowing campfires above the elevational closures if certain conditions are met or if a ranger conducts an assessment and permits the campfire.  AR 8940.  Further, they argue that the changes to campfire regulations are not significant in the 2005 Plan.  Defs.' Reply at 38.  Taken alone, the fact that the Forest Service changed its policy does not demonstrate a violation of NEPA or the Wilderness Act.  However, the specific change here was arbitrary and capricious in violation of NEPA and of the prohibition in the Wilderness Act on commercial services except "to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas."  Packing in firewood and coal will increase stock usage and loads, causing further damages to the wilderness, as noted by the Acting Superintendent of the Sequoia and Kings National Parks.  Further, packing in firewood risks introducing pathogens.  AR 8489 ("Under this alternative [2-Modified], there would be a moderate risk of the introduction of pathogens and/or weed seeds on firewood brought in from outside the wilderness and increased unauthorized gathering of wood and campfires by non-packer clients. . . . If pathogens or weeds were introduced, the effects would be long-term, moderate to severe, and although beginning locally, could easily become widespread.").

In addition, the Plan permits campfires in wilderness areas where "more than one site indicates dead and downed fuel wood availability rated at '3' or below [on a scale of 1 to 5]."  AR 7517.  At the hearing, the parties discussed the impact of the firewood rule in the case of the Purple Lake area.  This area straddles the elevational boundary and, according to Plaintiffs, has three campsites above 10,000 feet, all of which have only scarce wood.  But, according to Plaintiffs, because at least one other campsite in the Purple Lake area has available wood, all campsites, including those above 10,000 feet with scarce wood, are open to gathering and burning wood.  This impact of the policy is not adequately analyzed in the FEIS.

United States District Court
For the Northern District of California

The Forest Service failed to adequately consider warnings from adjacent wilderness areas about the dangers of its proposed campfire policy and improperly relied on adaptive management to control the campfire policy.  This demonstrates that the Forest Service failed to take a hard look as required by NEPA at changing the elevational campfire closures.  Nor did the Forest Service adequately consider the impacts on the environment under the Wilderness Act of the changed policy.

**The Forest Service's decision to implement a 15 person and 25 stock group size does not violate NEPA's requirement to consider reasonable alternatives.**

Plaintiffs contend that the maximum party size limit of 15 persons and 25 stock violates NEPA because the EIS failed to consider the reasonable alternative maximum group size of 12 persons and 20 stock imposed by this Court's injunction from 2002 to 2005.[5]  AR 8886.  Defendants defend the party size limits, saying that wilderness party size is the lowest ranked problem in the wilderness.  AR 8893 (In 1993, it was ranked as 13th in a list of problems identified by hikers.).  Defendants also point to findings in the ROD to show that they took a hard look at this issue.  AR 8893 (Less than 2% of commercial trips have party size larger than 12 persons and 20 stock: "With relatively few occurrences of large commercial pack stock parties in these wildernesses it does not seem either necessary or effective to arbitrarily reduce the party size to respond to social concerns expressed by a small percentage of visitors."); 8893 ("Reducing party size would not likely reduce the overall stock numbers (which is a greater concern) and may, in fact, lead to a greater number of small parties and stock.").  Defendants also point to neighboring wildernesses that use the 15 persons and 25 stock limits, except for SEKI, which uses a 15 persons and 20 stock limit.  AR 8893.

An EIS must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1. The range of reasonable alternatives is measured against the "Purpose and Need" section in the Environmental Impact Statement for the proposed rule:

> Project alternatives derive from an Environmental Impact Statement's "Purpose and Need" section, which briefly defines "the underlying purpose and need to which the agency is responding in proposing the alternatives including the

---

[5]      Plaintiffs stated at the hearing that they do not allege a violation of the Wilderness Act with respect to the maximum group size.

1      proposed action." 40 C.F.R. § 1502.13.  The stated goal of a project necessarily
2      dictates the range of "reasonable" alternatives and an agency cannot define its
       objectives in unreasonably narrow terms.

3    Carmel-by-the-Sea v. United States Dep't of Transp., 123 F.3d 1141, 1155 (9th Cir. 1997).  The

4    2005 Plan identifies two needs to be addressed: additional guidance for managing commercial pack

5    stock operations, and a trail plan that accurately identifies a system of trails for all users and

6    appropriate trail management objectives for each trail.  AR 7479.  The Plan further specifies several

7    goals: to comply with the Wilderness Act by preserving wilderness character; to provide for needed

8    commercial pack stock services; to comply with the Court's injunctive relief order; to identify

9    monitoring requirements to facilitate responsive adaptive management for commercial pack stock

10   use; and to identify the appropriate level of grazing associated with commercial pack stock

11   operations.  AR 7479-80.

12         The group size limit of 12 persons and 20 stock was included in Alternative 4 to the EIS (AR

13   7541), albeit only briefly.  While it would have been helpful for the Forest Service to analyze the

14   impact of the Court's prior limitations of party size to 12 persons and 20 stock before deciding

15   whether to increase the limit in view of the goals of wilderness and resource protection, the Court

16   does not conclude that the Forest Service violated NEPA.  The Forest Service pointed to research

17   that "party size may have the least effect on physical impacts than other managerial controls," and

18   that "of these behaviors [party size limits, requiring feed to be packed in for stock, encouraging

19   riders to stay on trails, restricting loose herding of stock on trails, restricting the practice of tying

20   stock to trees, encouraging the use of hitchlines, restricting the practice of picketing stock,

21   encouraging the practice of hobbling stock] limits on party size may have the least effect on physical

22   impacts."  AR 8892-93; see City of Carmel-by-the-Sea, 123 F.3d at 1154-55 ("The Environmental

23   Impact Statement need not consider an infinite range of alternatives, only reasonable or feasible

24   ones.") (citing 40 C.F.R. § 1502.14(a)-(c)).

25         **Muir Trail Ranch**

26         Motorized vehicles are generally prohibited in the wilderness.  See 16 U.S.C. § 1133(c).

27   Since 1948, Muir Trail Ranch has been operating a guest ranch in the wilderness under a special use

28   permit for using and maintaining a jeep access road between a boat landing and the guest ranch.  AR

United States District Court
For the Northern District of California

8108; 8753.  Access to the ranch is by four-wheel drive.  AR 8108.  Some route confusion and a high density of trails has resulted from the presence of the road to Muir Trail Ranch.  Id.  However, the Forest Service determined that analysis of the access to this private land was outside the scope of the FEIS.  AR 8753.

The Wilderness Act preserves "such rights as may be necessary to assure access to . . . State-owned or privately owned land," which likely grandfathers in use of this road.  16 U.S.C. § 1134(a).  Moreover, a House Report recommending passage of the California Wilderness Act, 16 U.S.C. § 543, et seq., notes that "the boundaries of the wilderness additions [under the California Wilderness Act] were drawn with the understanding that traditional motorized access will be allowed in the private inholdings within the wilderness by special use permit," and concludes that "the designation as wilderness will not preclude the Forest Service from continuing to issue appropriate special use permits for access to and from those properties."  SAR 0001-03; H.R. Rep. No. 98-40, at 21-22 (1983).

The Court agrees with Defendants that the Forest Service did not act arbitrarily in concluding that this issue is outside the scope of the FEIS.  Although Plaintiffs argue that the Muir Trail Ranch road is used in some unknown part for commercial packstock services, there is no evidence in the record that this use is frequent or significant, and the road is authorized as necessary to allow access to private land.

**IV.    Conclusion**

Accordingly, Plaintiffs' Motion for Summary Judgment and Defendants' Cross-Motion for Summary Judgment are granted in part and denied in part.  The Court will hold a status conference on November 20, 2007 at 10:00 a.m. to discuss with the parties a briefing schedule for injunctive relief.  A joint statement containing a proposed briefing schedule shall be filed no later than November 13, 2007.  In preparing their joint statement, the parties should keep in mind that the Court prefers staggered, rather than simultaneous, briefing.

**IT IS SO ORDERED.**

Dated:  October 30, 2007

_Elizabeth D. Laporte_
ELIZABETH D. LAPORTE
United States Magistrate Judge