IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HIGH SIERRA HIKERS ASS'N, et al., | No. C-00-01239 EDL |
| Plaintiffs, | **ORDER FOR INJUNCTIVE RELIEF** |
| v. | |
| RANDY MOORE, et al., | |
| Defendants, | |
| NATIONAL FOREST RECREATION ASS'N, et al., | |
| Defendants-Intervenors. | |

On April 10, 2000, Plaintiffs High Sierra Hikers Association, et al. ("Plaintiffs") filed this action for declaratory and injunctive relief against Defendants Bradley Powell, et al. ("Defendants")[1], alleging violations of the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1687, the Wilderness Act, 16 U.S.C. §§ 1131-1136, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370d and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 arising from the Forest Service's allowance of special use permits for commercial packstock operations in the Ansel Adams and John Muir Wilderness areas. On June 5, 2001, the Court issued an order regarding the merits of the parties' cross-motions for summary judgment, and on January 9, 2002, after further briefing, issued an order granting injunctive relief. Both sides

---

[1] Defendant Powell has been replaced as a defendant in this matter by the current Regional Forester of the Forest Service, Randy Moore.

appealed.

On December 1, 2004, the Ninth Circuit issued its decision affirming the Court's ruling that the Forest Service violated NEPA and the Court's order of injunctive relief. See High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630 (9th Cir. 2004). The Ninth Circuit reversed the Court's grant of summary judgment in favor of the Forest Service under the Wilderness Act, remanding "for a determination of appropriate relief under the Wilderness Act for remediation of any degradation that has already occurred." Blackwell, 390 F.3d at 649.

At a status conference in February 2005, the parties agreed that the question of remediation of past wilderness degradation should be held in abeyance until the Forest Service completed the court-ordered environmental analyses pursuant to NEPA by the end of 2005 and 2006. Subsequently, on December 27, 2005, the Forest Service issued a Final Environmental Impact Statement ("2005 FEIS") and Record of Decision for the Trail and Commercial Pack Stock Management in the Ansel Adams and John Muir Wildernesses ("2005 ROD") adopting Alternative 2- Modified from the FEIS to address the cumulative impacts of pack stock operations in the Ansel Adams and John Muir Wilderness Areas. Administrative Record ("AR") 8880, et seq. On August 31, 2006, Plaintiffs filed an amended complaint challenging the 2005 ROD.

In May 2007, Plaintiffs filed a motion for summary judgment alleging that the Forest Service violated the Wilderness Act and NEPA, and seeking wide-ranging injunctive relief. On October 30, 2007, the Court granted in part and denied in part Plaintiffs' Motion for Summary Judgment and granted in part and denied in part Defendants' Cross-Motion for Summary Judgment. The factual background is set forth at length in the Court's October 30, 2007 Order, as well as its earlier June 5, 2001 Order and the Ninth Circuit's decision on appeal. In the October 30, 2007 Order, the Court held that: (1) the Forest Service's reliance on the 2005 Needs Assessment to calculate need for commercial packstock services was arbitrary and capricious; (2) the Destination Management plan contained in the 2005 Plan violated the Wilderness Act; (3) the Forest Service failed to take a hard look as required by NEPA at the harm caused to the Yosemite Toad by commercial packstock services; (4) the Forest Service failed to take a hard look at water quality issues in the 2005 FEIS and allowed further degradation through increased grazing in already impacted areas in violation of

the Wilderness Act; and (5) the Forest Service's change to the campfire policy was arbitrary and capricious in violation of the Wilderness Act and NEPA.

On January 11, 2008, Plaintiffs filed a motion for permanent injunction based on the Court's finding of violations in the October 30, 2007 Order. On March 28, 2008, after full briefing on the injunctive relief by the parties as well as by Defendants-Intervenors, the Court held a hearing on Plaintiffs' motion for permanent injunction. On March 31, 2008, the Court issued an Order requiring the parties to meet and confer to narrow the issues and file a joint proposed order on injunctive relief. On April 15, 2008, the parties submitted their proposed order, which continued to dispute almost all aspects of the proposed relief.

**DISCUSSION**

As stated in High Sierra Hikers v. Blackwell, 390 F.3d 630, 641-42 (9th Cir. 2004):

> A district court has "broad latitude in fashioning equitable relief when necessary to remedy an established wrong." Natural Res. Def. Council v. Southwest Marine, Inc., 236 F.3d 985, 999 (9th Cir.2000) (internal quotation marks omitted). The traditional bases for injunctive relief are irreparable injury and inadequacy of legal remedies. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987). In issuing an injunction, the court must balance the equities between the parties and give due regard to the public interest. Id. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable." Id. at 545. . . . In the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action. Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir.1985). While an injunction does not automatically issue upon a finding that an agency violated NEPA, "the presence of strong NEPA claims gives rise to more liberal standards for granting an injunction." American Motorcyclist Ass'n v. Watt, 714 F.2d 962, 965 (9th Cir.1983). If environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment. Amoco, 480 U.S. at 545, 107 S.Ct. 1396. . . . In determining whether to issue an injunction, courts also consider the public interest. Amoco, 480 U.S. at 542, 107 S.Ct. 1396.

Blackwell, 390 F.3d at 641-42. Plaintiffs have demonstrated the need for injunctive relief. As described in the Court's October 30, 2007 Order, the Forest Service has violated the Wilderness Act and NEPA in significant aspects. Further, the Court has found that environmental injury flowed from these violations. For example, the Court stated that the 2005 Destination Management Plan permitted environmentally harmful spikes in usage during peak periods. See Oct. 30, 2007 Order at 17:26-18:1. Thus, environmental injury is not only "sufficiently likely" in the Ansel Adams and John Muir wilderness areas, but it has already actually occurred. See Amoco, 480 U.S. at 545.

**United States District Court**
For the Northern District of California

3

Further, here, the environmental impact is upon two wilderness areas. Congress enacted the Wilderness Act "to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition." 16 U.S.C. § 1131(a) (2000). The Act established a National Wilderness Preservation System composed of "wilderness areas" which "shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness. . . ." Id. The Act defines wilderness "in contrast with those areas where man and his own works dominate the landscape, . . . as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c) (2000). Therefore, the strong public interest in maintaining pristine wild areas unimpaired by man for future use and enjoyment which Congress recognized in the Wilderness Act also weighs in favor of an injunction.

In ordering injunctive relief, the Court is mindful of the legitimate interests of the Intervenors, who fear that the restraints on their use of commercial packstock in the wilderness requested by Plaintiffs will threaten their livelihoods. The Court realizes that the vast majority of commercial packstock services are family owned and run businesses that operate out of love for the wilderness rather than strictly commercial motives. Intervenors have submitted numerous affidavits attesting to the potential harm that would result if the Court sharply curtailed pack station use through an injunction. See Intervenors-Defendants' Opp'n to Pls.' Mot. for Injunction Relief Ex. 1 (Declaration of Ruby Allen); Ex. 2, 3 (Declarations of Danica Radulovich-Berner); Ex. 4 (Declaration of John Cunningham); Ex. 5 (Declaration of Dave Dohnel); Ex. 6, 7 (Declarations of Karla Hurley); Ex. 8 (Declaration of Jennifer Roeser); Ex. 9 (Declaration of John Summers); Ex. 10 (Declaration of Robert Tanner); Ex. 11 (Declaration of Dennis Winchester). However, the very nature of their businesses, that is, packstock animals carrying many pounds of weight in the wilderness, has been shown to cause environmental injury that must be remedied. Moreover, the economic data shows that the average incomes (not adjusted for inflation or increases in costs) of all ten of the packers for whom complete data was available *increased* while they operated under the

Court's prior injunction (2002-2003), as compared to the three years before the injunction (1999-2001), and none of them went out of business. See AR 14174 (2004 Draft Report to Congress). Yet the Intervenors also strongly opposed the previous injunction on the grounds that it would effectively "shut down" their businesses. See Pls.' Reply to Mot. for Inj. Relief at 6:16-17. Moreover, the 2005 FEIS noted that commercial pack stations provide a small percentage of the personal income and employment in the region. AR 8214; see also AR 7764-65 (the IMPLAN economic model shows that on a regional level, approximately 114 direct jobs, 14 indirect jobs and 37 induced job are supported by the pack stations operations). Specifically, commercial pack stations contribute .02 to .04 percent of all employment in the county, and .006 to .009 percent of all income. AR 8214. Therefore, while the Court is sympathetic to the packers' and their customers' concerns and has taken them into account in imposing fewer restrictions than Plaintiffs request, the prediction of potential economic harm must be viewed in light of the actual experience under the last injunction. Further, "the loss of anticipated revenues, however, does not outweigh the potential irreparable damage to the environment." National Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 738 (9th Cir. 2000).

Here, the balance of harms and the public interest favor the issuance of an injunction to prevent further harm to the environment. At the same time, the Court has worked to craft a fair and balanced injunction that provides relief for the environment arising from the violations of the Wilderness Act and NEPA without unduly curtailing the packers' operations.

As stated at the hearing and in this Order, the Court adopts a combination and refinement of remedies that have been proposed by the parties at the hearing and in their post-hearing submission. The purpose of the remedies is to mitigate the impact on the environment caused by violations of the Wilderness Act and NEPA. As an initial matter, the Court will set aside the 2005 ROD, rather than sever portions of it and implement portions that are not inconsistent with the Court's Orders, resolving a dispute between the parties that appears more semantic than substantive. See Southeast Alaska Conservation Council v. U.S. Army Corps of Engineers, 486 F.3d 638, 654 (9th Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency action is to "set aside" the action. 5 U.S.C. § 706(2). In other words, a court should 'vacate the agency's action and remand to the

agency to act in compliance with its statutory obligations.' [citation omitted]."). In accordance with Southeast Alaska, the 2001 Plan will be reinstated.

The parties are generally in agreement about the issue of permit administration, but one minor point of disagreement remains as to whether Defendants must engage in "cross-checking and reconciliation" of the data from the prior season's wilderness permits. Because Defendants will be making the raw data from wilderness permits and tally sheet records publicly available, at this time, the Court sees no reason to also require Defendants to manipulate that data. Should problems arise, Plaintiffs may confer with Defendants to seek to resolve them and bring to the Court's attention if truly necessary.

A primary issue in this case is the amount of use in the wilderness. The Wilderness Act prohibits commercial enterprises in wilderness areas (16 U.S.C. § 1133(c)), but authorizes commercial services within wilderness areas "to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas." 16 U.S.C. §1133(d)(5). Accordingly, Plaintiffs argue that service days should be reduced by 30% from the actual use levels during 2002-2004, calculated from a survey of some wilderness users contained in the Needs Assessment that showed that 19% of actual overnight wilderness trips were not deemed necessary in 2004 (see AR 8867) and adding an 11% "cushion." Defendants argue that service days should not be further reduced from the actual use levels from that time. Intervenors argue that amount of use should not be based on actual use at all.

Plaintiffs' proposed 30% reduction is not supported by the record and would be unduly harsh on the packers and their customers. The Needs Assessment stated that 19% of overnight wilderness trips were not necessary, but that survey was only based on 335 respondents. See AR 8867. Thus, while the Needs Assessment shows some overuse, it is not sufficiently reliable to treat 19% as a precise quantification. Further, the Needs Assessment also showed considerable legitimate need on the part of those who otherwise could not gain access to the wilderness. On the other hand, while the Court is mindful of the Intervenors' argument that further reduction will be harmful to their businesses, economic consequences are not dispositive. See Sierra Nev. Forest Prot. Campaign v. Tippin, 2006 WL 2583036, *21 (E.D. Cal. Aug. 16, 2006) ("The court is not unmindful of the

adverse economic consequences that can result when environmental laws are violated. Such consequences may include loss of revenues to both the government and private business. Importantly, workers, their families, and the community also may be adversely affected by a finding that the Forest Service has failed to abide by the legal requirements of NEPA and NFMA. Nevertheless, the 'loss of anticipated revenues ... does not outweigh the potential irreparable damage to the environment.' [citations omitted]."). Accordingly, the Court has determined that a reduction of 5% from 2002-2004 actual use, coupled with the other restrictions that will be part of the injunction, adequately addresses Wilderness Act remediation as well as the NEPA violations.

Nor is the Court inclined to adopt Plaintiffs' proposal that service days be used prospectively in the same proportion for the same type of trips (e.g., full-service trips) as they were during the 2002-2004 time period. Plaintiffs have not made a showing to justify proportionality as a wilderness protection given the other controls on use that will be ordered. Similarly, the Court declines to limit set-up, take-down or resupply trips as long as those trips are debited against service days, which could engage the Court in undue micro-management.

With respect to day rides, the parties agree that day rides should only occur on approved trails, but disagree as to which approved trails. Plaintiffs argue for trails as described in Alternative 4 in the 2005 ROD and Defendants argue for trails as described in Alternative 2-modified in the 2005 ROD. See AR 7564, et. seq. Plaintiffs have not made a sufficient showing that Alternative 4 should be adopted, particularly considering the other restrictions that will be ordered by the Court.

Another highly disputed issue is trailhead quotas. Under the 2001 Plan, for entry points with currently low levels of commercial use, no commercial use or for which the Forest Service has not identified a compelling need for commercial services, use can be approved on a case-by-case basis using several criteria, including that trips would not be advertised and service would be occasional. See AR 1469. Plaintiffs argue that Defendants allowed commercial packstock use on at least four of the case-by-case entry points without establishing that these criteria were satisfied. See, e.g., AR 9064. Defendants do not dispute having done so. Environmental harm may have occurred if case-by-case itineraries were approved without determining that environmentally protective criteria were met. No party disputes that the criteria are sufficient, so the Court concludes that requiring

7

compliance with the criteria for case-by-case itineraries would contribute to remediation of Wilderness Act violations.

The parties dispute whether split quotas, that is, borrowing from the next day's quota, are appropriate. Split quotas allow packers to accommodate the needs of the public while not increasing their overall numbers. Plaintiffs argue that split quotas are not justifiable because even though overall use does not increase, split quotas undermine the efficacy of quotas in preventing spikes. However, other controls on use in this injunction help reduce spikes.

Plaintiffs and Defendants each propose imposition of a stock-to-person ratio; Plaintiffs propose a 1:3 ratio and Defendants propose a 1:1.5 ratio. Based on evidence submitted by Defendants and unrefuted by Plaintiffs, a 1:3 ratio may be too restrictive, at least for overnight trips, because it strictly limits the amount of gear a pack animal can carry. Specifically, a pack animal can only carry 150 pounds of gear plus the saddle. See Tanner Decl. in Opp. to Pls.' Mot. for Prem. Inj. ¶ 3. A person eats four pounds of food per day, is limited to forty or fifty pounds of personal gear and the packer uses approximately seventy-five pounds. Tanner Decl. ¶ 5. Tanner opines that a three person/five day trip, which under Plaintiffs' ratio would be allowed one additional mule in addition to the animals carrying riders, would require sixty pounds of food, one hundred and twenty pounds of personal gear, seventy-five pounds of gear for the packer, and one hundred and fifty pounds of other equipment for a total of four hundred and five pounds, much more than one mule can carry. Moreover, Plaintiffs acknowledged that a 1:1.5 ratio is the status quo for spot and dunnage trips.[2] Although Plaintiffs are correct that lightweight gear and food and elimination of unnecessary items may reduce the load, permitting a lower ratio, Plaintiffs have not provided sufficient evidence to support their requested ratio. At the hearing, the Court ordered the parties to meet and confer on this issue to try to reach a middle ground. According to the parties' April 15, 2008 submission, no middle ground was reached. The Court will order the 1:1.5 ratio, which is feasible and is already the ratio used for spot and dunnage trips.

Plaintiffs seek to impose an annual stock day limit of 6,933 as a complement to the stock-to-

---

[2] For spot trips, "visitors ride and their gear is packed to a pre-selected area." AR 8859. For dunnage trips, "visitors' backpacks, food and camp equipment are packed into a specific location and they hike to meet it." Id.

8

person ratio. Stock days are defined by Plaintiffs as "the number of stock used for a day or any part of a day, including all commercial stock used in wilderness." See Reply in Support of Mot. for Perm. Inj. at n. 28. This issue was not raised in this case prior to the briefing on injunctive relief. Moreover, stock in the wilderness are already limited by service days, stock-to-person ratios and trailhead quotas. Therefore, the Court declines to impose this additional limitation.

The Court has previously determined that commercial packstock can cause harm to the Yosemite Toad. See Oct. 30, 2007 Order at 21. Plaintiffs therefore urge the Court to prohibit commercial entry, grazing or travel in all occupied Yosemite Toad breeding or upland habitats, including those within 150 meters of "ephemeral streams, springs and seeps," except on approved trails. Defendants argue that stock grazing and entry should be prohibited in occupied Yosemite Toad breeding and rearing habitat and within 100 yards of any permanent water source throughout the breeding cycle. Such restrictions are necessary to protect the Yosemite Toad's habitat. Plaintiffs also propose banning stock near ephemeral streams. While the Court urges the packers to avoid such areas, it declines to incorporate such a restriction in the injunction because it would be imprecise. Accordingly, the Court will prohibit stock in areas of permanent water sources. Further, in order to achieve adequate protection for the Yosemite Toad, the duration of the proposed prohibition on stock in Yosemite Toad habitats shall be based on the California Department of Water Resources Bulletin 120 issued in May of each year as proposed by Defendants. Defendants proposed a seventy-day period for the prohibition on stock entry or grazing starting on the date of the estimated start of breeding. Because of the uncertainty of predictions and the highly precarious status of the Yosemite Toad, the prohibition on packstock shall start ten days before and shall extend for eighty days after the predicted start of the breeding season based upon Bulletin 120, i.e., a total of ninety days.

The parties also submit competing proposals for restrictions on campfires. While Plaintiffs and Defendants are in general agreement on the issue of campfires, Intervenors propose permitting charcoal fires anywhere that campfires would be prohibited under Plaintiffs' and Defendants' approaches. As discussed at the hearing, however, packing in charcoal would add more weight to the pack animals that would in turn cause additional environmental damage. Moreover, permitting

9

1 only one type of fuel would be confusing to other wilderness users, who may see a fire and believe
2 that they can also have a fire despite the elevational closures.

3 With respect to degraded meadows and streams, Plaintiffs argue that the Court should
4 prohibit commercial packstock use in areas with degraded meadows and streams unless those areas
5 are in Proper Functioning Condition.[3] Defendants argue that grazing should only be prohibited in
6 areas that are Functional-At-Risk with a downward or unknown trend, but that the Forest Service
7 would continue to monitor the areas and would prohibit further grazing that show additional
8 hydrologic function degradation. Plaintiffs, however, have provided no evidence that Functional-At-
9 Risk streams with upward trends would be further degraded and lose their upward trend if the status
10 quo were to continue.

11 Plaintiffs propose that the provisions related to trails and travel in Alternative 4 to the 2005
12 Plan be adopted and that no new trails be approved for use by commercial packstock. The Court did
13 not make any ruling on summary judgment about trail maintenance. Nor have Plaintiffs provided
14 support for imposing Alternative 4 regarding trails. In addition, the parties agree that new trails
15 would require NEPA analysis, so an absolute prohibition on new trails is not warranted. The Court
16 declines to issue any order regarding new trails.

17 The final issue is more procedural than substantive, as it concerns the mechanism for
18 terminating the injunction. Plaintiffs seek a permanent injunction to remain in place until further
19 order of the Court, with a procedure for modification. See Northwest Ecosystem Alliance v. Rey,
20 2006 WL 44361, *9 (Wilderness Act. D. Wash. Jan. 9, 2006) (ordering as part of a permanent
21 injunction: "No project or activity enjoined under this Order may occur unless and until this Court
22 modifies or vacates this Order."); Oregon Natural Resources Council v. U.S. Forest Service, CV 03-
23 613-KI (D. Or. Nov. 21, 2003) (attached as Pls.' Ex. J) (ordering injunctive relief to remain in effect
24 until the court resolves any objections to ground-disturbing activities and determines that the Forest
25 Service complied with NEPA); Montana Wilderness Alliance v. Fry, 408 F. Supp. 2d 1032, 1039-

---

[3] Under the Proper Functioning Condition protocol, streams are evaluated for their functional condition, and given a rating of properly functioning, functional-at-risk with an upward trend, functional-at-risk with no apparent trend and functional-at-risk with a downward trend. See AR 8239, 8246. Of the 230 meadows evaluated in the FEIS, 93 were found to have "at least slight hydrologic function alteration" and 17 have severe hydrologic function alteration. AR 8257.

40 (D. Mt. 2006) (ordering injunctive relief to remain in effect until dissolved by the court); <u>Florida Key Deer v. Brown</u>, 386 F. Supp. 2d 1281, 1291-92 (S.D. Fla. 2005) (ordering injunctive relief pending completion of remand or further order of the court). Defendants argue that the injunction should specify that it remains in effect only until either: (1) "Defendants certify that they have undertaken further analysis consistent with the Court's October 30, 2007 Order;" or (2) Defendants appeal the October 30, 2007 Order and either prevail or comply with any requirements of an appellate mandate. <u>See</u> <u>Northern Cheyenne Tribe v. Norton</u>, 503 F.3d 836, 844 n. 30 (9th Cir. 2007) (discussing cases imposing interim relief pending compliance with NEPA). The first part of Defendants' proposal is somewhat vague and may leave room for dispute about compliance, and all of the triggers that Defendant proposes can be brought before this Court on an appropriate motion. Accordingly, and in the interest of clarity, the Court will adopt a modified version of Plaintiffs' proposal.

**INJUNCTIVE RELIEF**

The Court orders the following injunctive relief:

1. The 2005 ROD is set aside and shall not be implemented, except as specified below.
2. The 2001 Plan is reinstated and shall be implemented, consistent with the provisions below. While the 2001 Plan is hereby reinstated, to the extent that any conflicts exist between any plan provision and this injunction, this injunction supersedes the plan provision.
3. The following permit administration provisions shall be in force:
   a. The Forest Service will be solely responsible for authorizing pack stock services and will issue uniquely numbered permits in the name of the client who is the group leader. The permit will include the group leader's address.
   b. The permit will specify the group's entry and exit dates, entry and exit trail heads, destination, party size, and type of trip.
   c. No permits will be issued directly to commercial permittees, pack stations, or pack station employees, except in the case of full-service trips where pack station personnel accompany the trip for its duration.

11

|   |   |   |
|---|---|---|
| | d. | Commercial pack stock permittees shall record all services on tally sheets, including, for each overnight trip, permit number, service start and end dates, entry and exit trail heads, number of clients, number of overnight employees, number of riding pack stock (recorded separately), type of trip (including whether one- or two-way), campsite or drop-off/pick-up spot used, number of service days used, location of any grazing (including the number of stock grazing), and the number of days in a National Park (if applicable). For day rides starting from pack stations, commercial pack stock permittees shall record the number of clients and the duration and destination of each trip. |
| | e. | Each pack station shall verify that its client has a valid wilderness permit before providing any services. |
| | f. | By the 15th of each month, each permittee shall submit to the Forest Service records of all services provided during prior month. |
| | g. | By January 21st of each year, the Forest Service will make available to the public an accurate annual compilation that includes all tally sheets and permit records for the previous calendar year. Before making public the permits, the Forest Service may redact information as required under applicable federal privacy laws. |
| 4. | | The following amount of use provisions shall be in force: |
| | a. | Overnight use: A total number of service days for overnight use may be authorized for use equivalent to the 95% of the average annual use between 2002 and 2004. The Forest Service may allocate those service days among pack stations as appropriate to account for current patterns of use and resource concerns. |
| | b. | Day use: Day use shall not exceed 3,690 service days. |
| | c. | None of the temporary pool of 3,000 service days authorized by the 2001 Plan may be allocated to providers of commercial pack stock services for the purpose of providing such services. |

        d. Camp set-up, take-down, and resupply trips shall be debited against service days by multiplying the number of stock needed to provide the service for such trip by the number of days needed to accomplish the service.

        e. Day rides, including rides from overnight camps during full-service trips, may occur only on approved system trails as identified on Table 2.26 of the Final Environmental Impact Statement for the 2005 Plan, AR 7564–90.

5. The following provisions regarding trailhead quotas shall be in force:

        a. The commercial trailhead quotas in the 2001 Plan shall be implemented at the beginning of the 2008 operating season, and complied with. The Forest Service may seek an extension of time upon a showing of good cause.

        b. Case-by-case itineraries may be approved in accordance with the criteria set forth in the 2001 Plan. If any such itinerary is approved, a publicly available Forest memorandum shall be prepared contemporaneously.

        c. In addition to implementing the trail head quotas referenced in Paragraph 5.a., the Forest Service shall limit each pack station's use of destinations in areas designated as "red" on the Forest Service's Use-Overlap-Impact Analysis, AR 13419–567, to 80% of historic use.

6. For all types of trips authorized under this Order, pack stock shall be limited by a 1:1.5 stock-to-person ratio. Accordingly, for every multiple of 3 persons (including pack station personnel accompanying or otherwise servicing such a trip), 2 pack animals shall be allowed in addition to 3 riding stock.

7. The Forest Service shall prohibit all pack stock grazing and entry in occupied Yosemite Toad breeding and rearing habitat throughout the breeding cycle (through metamorphosis). In addition, during the breeding and rearing cycle, the Forest Service shall prohibit any pack stock entry or grazing within 100 yards of any permanent water source within occupied Toad habitat. The duration of the breeding and rearing cycle each year shall be based on the "wet" or "dry" year predictions based on the California Department of Water Resources Bulletin 120 (issued May 1

13

of each year). The prohibition on entry into Yosemite Toad habitats shall begin ten days before and extend for 80 days after the estimated start of breeding based upon Bulletin 120.

8. The following provisions regarding campfires shall be in force:

   a. The Forest Service shall implement the 10,000 ft./10,400 ft. elevational campfire restrictions set forth in the 2001 Plan and prohibit exceptions to those elevational closures. Where a destination straddles the closure line, the collection of wood below the line for use above the line shall be prohibited.

   b. The Forest Service shall prohibit the packing in or use of wood or any other solid fuel in areas closed to campfires.

   c. In addition to the elevational closures set forth above, the Forest Service shall implement additional, site-specific campfire closures in accordance with the criteria set out in the 2001 Plan. Specifically:

   (1) Where 50% or more of campsites in an area otherwise open to campfires are rated at "4" or "5" for wood availability, fires shall be prohibited in those areas.

   (2) Where 50% or more campsites in an area show a change in wood availability by a factor of one (e.g., move from "1" to "2," or "3" to "4"), campsites in those areas will be considered for closure.

   (3) Where 50% or more of the duff, litter, or fine woody material has been removed from an area, those areas will be considered for closure.

   d. By December 31, 2009, the Forest Service shall conduct the campsite surveys necessary to make determinations concerning such closures; the areas surveyed shall be those set out in Table 2.32 of the Final Environmental Impact Statement for the 2005 Plan, AR 7655–64.

9. All designated campsites, stock holding areas, and spot and dunnage loading and unloading areas shall be allowed no closer than 100 feet from water.

10. The Forest Service shall prohibit grazing in meadows containing streams that are

rated as Functional-at-Risk ("FAR") with downward or unknown trends. The Forest Service shall monitor all meadows containing streams that are rated FAR with an upward trend, and in which grazing is permitted, in accordance with the criteria set out in Appendix A of the 2005 Record of Decision, AR 8938, and shall further prohibit grazing in any such meadows that indicate movement towards hydrologic function degradation.

11. This injunction shall remain in effect unless and until it is modified or vacated by an order of this Court or of the Court of Appeals. If a party seeks to modify any provision of this injunction, it shall first meet and confer with the other parties, in order to attempt to reach agreement before applying to the Court.

**IT IS SO ORDERED.**

Dated: May 8, 2008

*Elizabeth D. Laporte*
ELIZABETH D. LAPORTE
United States Magistrate Judge